and we're ready to proceed. Good morning, Jeffrey Raskin for Appellant ITT Incorporated. Our briefs contain substantial discussion of contract interpretation. We supplemented that after the fact by submission of the Sacramento Downtown Arena case from the Eastern District of California, holding among other things that the FM policy is broad and broader than a lot of the policies at issue in the other cases. I want to leave the contract interpretation discussion to the briefs because whatever the interpretation of the FM policy is, ITT's amended complaint stated a claim for breach of contract. So I want to focus on the amended complaint. There's five salient points, even though it's a very long complaint. I'm going to reference paragraph numbers as I go. ITT noted at paragraph nine of its complaint that it's a diversified, worldwide manufacturing company supplying product and services to the aerospace, communications, energy, and technology sectors. It employs 10,000 people in more than 35 countries. Its business operations are markedly different than those of an art gallery, a martial arts studio, a dentist's office, or a coffee shop. It noted that at paragraphs 55 and 56, that employees showed up to its facilities with COVID in the United States, Mexico, South America, Europe, and Asia. And therefore, its facilities had the presence of COVID-19 on premises in March and April of 2020. It noted the state of the science in paragraphs 40 through 49 of its amended complaint as of the fall of 2021 when that document was filed. There's a lot in those allegations, but at paragraph 45, it noted that the science had determined that COVID could cause tangible, measurable, physical alteration of property. It noted at paragraph 44 that industrial workspaces, such as those at ITT's facilities, are particularly susceptible to damage by COVID because of the persistence of non-porous, hard surfaces. What is the significance of the difference between a coffee shop or a restaurant or another place of business and your client's facilities? Because what's damaging and dangerous at an industrial facility, manufacturing precision products for use in aerospace might not be damaging at a martial arts studio or an art gallery. Context is important. One size doesn't fit all. But if COVID, but if the presence of a communicable disease in a facility results in physical alteration of the property, wouldn't that be true regardless of what is done at the property? Are you saying there's something about the manufacturing facility that has a different sort of surfaces? I think that the policy covers ITT against all risks of physical loss or damage. The insurer is then taking it's insured as it's insured business operations exist. Machinery that costs several million dollars is different than exercise mats. So ITT determined, and there's an allegation in paragraph 59A of the amended complaint, that it needed to remediate, replace, and dispose of both real and personal property. Both of which are covered under this policy. At the pleading stage, that's not subject to dispute. ITT made that determination. It needed to what, did you say? Remediate? Remediate. Clean up? Clean up. Right, fix, dispose of, and replace. That's the allegation in paragraph 59A. Well, but I don't, I still don't understand how that wins the argument. There's no question that the presence of harmful microbes on equipment, on table tops that are used by employees can affect, can require to be cleaned up for the business to function. But when you say to clean up, that kind of implies that the property was not damaged. It could be just cleaned, and you clean it, and now it's usable. But property damage is generally something that can't be dealt with just by cleaning. The allegation in 59A is remediation, replace, and dispose. Those are allegations of damage one way or the other, whether it had to be disposed of or cleaned up. There were plenty of cases in the past, physical loss or damage, that involved remediation of property that had been damaged in one way. It wasn't disposed of. It was remediated, cleaned up, fixed. They talk a lot about- Are you saying that your policy differed from all the policies that were covered in the various precedents that talk about- Not on this point, but there's a lot of focus in a lot of the briefs in these cases on the repair or restoration provisions, which talk about not only replacement, but also returning the property to the condition that it was in prior to the problem. So the policies contemplate cleanup or fixing one way or the other once there is damage. So I wanted to get back to paragraph 55 of the amended complaint. It states that some of ITT's facilities were closed because of the presence of COVID on site, not just because some government order told them to close. The complaint identifies certain facilities, among others, that closed because COVID had been identified as being on site. So in the Kimchi case, which is discussed a lot in the briefs, the allegations by the Taekwondo studio were simply that COVID was ubiquitous. It must have been at its property. It must have caused some harm. This court, relying on Iqbal, said that was conclusory. It was generic. Those were not facts. ITT alleged real world events that happened at its facilities. Those are not conclusions. They're real world events. They're identified. The district court was not permitted to disregard those allegations and determine, as it did at paragraph 19 of its complaint, of its order, that ITT's property was unharmed and remained in the same condition as it was prior to the pandemic. ITT's amended complaint is contrary to that conclusion. It alleges necessary facts to support a breach of contract claim. So the district court's dismissal order and judgment should be reversed. Now, Mr. Laskin, you filed this case in the District of Connecticut. Yes. There's no question, I gather, that Connecticut law is the applicable law. Is that right? That's what we alleged. There's a discussion in New York law. Our position is we satisfy Connecticut or New York on the question of pleading a breach of contract claim under these circumstances. It used to be called the insurance state. Right. In an earlier time. It's been called many things, I guess. But there is a case, apparently, pending in the Supreme Court of Connecticut, of which you may be aware. Dermatology group. And it's pending. And I suppose the disposition of that case may be important, may turn out to be important to this case. It may be. I believe that it's been briefed by the insurers. I think replies might still be due. So it could be a while before that comes out. We're not asking the court necessarily to hold this until that comes out. Because we think we've satisfied even the most stringent standards in some of these cases out there. About showing physical alteration of property and actually cleaning up, repairing, disposing of damaged property. So unless the court has any additional questions, I'm going to yield to Ms. Labrera. Thank you. Thank you. Good morning. And may it please the court. Kelly Labrera on behalf of Factory Mutual Insurance Company. The appellee. This court has nine times dealt with the question as to whether the COVID-19 pandemic gives rise to business insurance claims. And nine times this court has decided that it does not. Nothing in ITT's case compels a different result. In fact, the Farmington case, which this court ruled on not very long ago, looked to the Capstone case in Connecticut and concluded that it had a sound basis to conclude how the Connecticut Supreme Court would rule on these types of matters. And it found that where there is no physical loss or damage, no tangible change to the property, or no dispossession of the property, there is no right to coverage. And that's where we are here. The complaint that ITT has put before the court contains conclusory allegations as to replacing of property. There is not a single, and I've looked, not a single allegation as to which property had to be replaced. And in fact, when this case was before Judge Underhill, he looked at the allegations in ITT's complaint and asked them to put more meat on the bones, as it were. Tell the court what precisely needed to be repaired or replaced. And the reason why we look for repair or replace is because that's what the pure language of the contract provides. Through the period of liability in the contract, the insured is required to present something that required either a repair or replace. In other words, physical damage would be the repair. Physical loss would be the replacement. There isn't any allegation in ITT's complaint, notwithstanding its operations and the type of work it does, to support that here there was physical loss or damage. And, Your Honor, the question that was asked earlier as to what differentiates ITT's facilities from a coffee shop, the answer is there isn't anything. COVID affected all of us the same way, in that it was definitely a threat to human health, but it was never a harm to physical structures. The courtrooms are standing, the hospitals are standing, and there was certainly a presence of COVID in hospitals. I'd also like to address for a moment the argument of my adversary concerning the presence of science, and that science has evolved. While there is no doubt that the science has evolved on COVID, it hasn't evolved to tell us anything about structural harm to property. What has evolved is the idea that vaccines may work and people may separate. Partitions in offices will help. And this is all to stem the spread of the communicable disease. Again, it's not to support the property or to reinforce the property. There's nothing that ITT has put in its papers which compels a different result, as I mentioned earlier, than the strong case law under both Connecticut and New York law that is before this panel. Did you want to comment on Connecticut dermatology and whether it would be advisable for us to wait on that decision or whether we need to? I'm happy to. Your Honor, I don't think that the court needs to wait. It sounds as if ITT is not asking for the court to wait. But moreover, in the Farmington case, this court looked to Capstone and said that it provided a sound basis to predict how the Connecticut Supreme Court would rule. And there's no reason to think that that has changed. Unless the panel has any further questions, I'm happy to rest on our papers. Is there not in the policy additional coverages? And does it include communicable diseases? What the policy has is limited additional coverages, and they are sublimated up to $1 million for the presence of communicable disease. ITT has recovered under that provision and has recovered $1 million. That particular provision, unlike the vast majority of the other provisions in the policy, does not require physical loss or damage, and that's why ITT was able to recover. So that's not a provision that's particularly helpful in your view to the opposing side? Well, ITT certainly attempts to make much of it, but in our view it is a limited additional coverage. It is an exception to the contamination exclusion, which applies in this case and certainly doesn't unlock the rest of the coverages under the policy and give ITT the right to $750 million. Is it possible that, in your view, that COVID-19 particles could cause actual physical harm to an insurance property? No, no, because there's no physical harm and they don't cause physical loss. Even by ITT's own allegations, it never physically lost its property, and none of its property required repair or replace, which again we go back to the clear and unambiguous language of the contract, which requires physical loss or damage, which is informed by the period of liability, which gives reference to repair or replace. And if ITT were to prevail, what's the estimate of the, how much is involved in that? How much would it, you used a very large number before, the kind that still rattles some people. The policy limit is $750 million. The communicable disease coverages are sublimated to $1 million, which has been paid to ITT. Could you just address that your adversary does point to this additional coverage for communicable disease and argues that since the policy provides for additional coverages, quote, for insured physical loss or damage, that that's some evidence that it must be the case that a communicable disease can cause physical loss or damage by virtue of the fact that it's in that part of the policy? I think Judge Merriam and Judge Underhill dealt with this argument, Your Honor, and they dealt with it in a very logical manner. The additional coverages in the policy have lead-in language, and that's what ITT refers to. But ITT only quotes part of the lead-in language. The rest of the lead-in language makes very clear that you have to look to the provisions themselves in that section, and the provision concerning communicable disease does not reference physical loss or damage. And that stands in stark contrast to the 29 other additional coverages that do mention either physical damage or physical loss or damage. So it's simply illogical to conclude that the lead-in language somehow trumps the rest of the policy, and not only is it illogical, but it would render the sublimit on the communicable disease coverages to be surplusage, which is contrary to the law in Connecticut and in New York. Thank you. Three points that I hope to be able to make really quickly here. The question of structural damage to real property being required as a prerequisite for coverage. The policies cover personal property, not just buildings, not just real property. If ITT suffered a catastrophic sprinkler failure at one of its facilities and its equipment was down, damaged for a month, it would be entitled potentially to business interruption coverage under the policy because its equipment was damaged, even though there was no structural damage to real property. Policy covers personal and real property. Whether COVID causes or in fact caused physical loss or damage at a particular property is a question of fact. It's a question of scientific analysis. It's not a legal question. Whether something happened is a question of fact. How a policy might apply and what it means is a question of law. Those are two different things. Ms. Labrera mentioned the sublimit for communicable disease. Communicable disease is not an exception to an exclusion. The coverage doesn't say that it is, and the contamination exclusion doesn't include communicable disease. Their position, and they've got a lot of traction on it nationwide, is that the communicable disease coverage is provided simply when there is the actual, not suspected, presence of communicable disease at property. They provide that coverage when there is no physical loss or damage. Well, if that's the case, then if the insurer is able to show physical loss or damage resulting from communicable disease, it's not in that coverage anymore. It's in the main coverage of the policy, and to the extent that they paid ITT a million dollars, that was a down payment, a prepayment. They get a credit for that. That's how it would work in the real world. The question was asked about how much money was at issue. The policy is $750 million. This is not in the complaint, but it was asked. ITT submitted materials to Factory Mutual in about December of 2020. The loss was about $20 million. So $750 million is not what's at issue. It's substantially less. So unless there's any questions, that's all I've got. Thank you both, and we'll take the matter under advisement.